**E-FILED**
Friday, 12 October, 2007  02:36:17 PM
Clerk, U.S. District Court, ILCD

FILED

OCT 1 2 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## PEORIA DIVISION

|  |  |  |
|---|---|---|
| **CATERPILLAR INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | Civil Action No. _07-1274_ |
| | ) | |
| **AON CORPORATION,** | ) | **Equitable Relief Sought** |
| **AON RISK SERVICES, INC. OF ILLINOIS,** | ) | |
| **and AON RE GLOBAL, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Caterpillar Inc. ("Caterpillar"), by and through its attorneys, brings this Complaint against Aon Corporation, Aon Risk Services, Inc. of Illinois, and Aon Re Global, Inc. (hereinafter collectively referred to as "Aon") for a trial by jury and states as follows:

### NATURE OF THE CASE

1.      This action is brought pursuant to the antitrust laws of the United States, as well as various state laws, and arises out of Aon's provision of services to plaintiff Caterpillar and others in the marketplace, all as described in greater detail throughout this Complaint. In brief, Caterpillar alleges that Aon and its co-conspirators entered into a combination and conspiracy in restraint of trade with respect to insurance, reinsurance, and brokerage services provided to Caterpillar and others, all in violation of applicable federal and state antitrust laws. Caterpillar also alleges that Aon engaged in consumer fraud and deceptive business practices in violation of state law, that Aon breached its fiduciary duty to Caterpillar and committed fraud, that Aon

breached its service contracts with Caterpillar, and that Aon engaged in an unlawful civil conspiracy and was unjustly enriched by the totality of its actions as described in this Complaint.

2.     Caterpillar seeks to recover the actual damages that Aon's improper and unlawful conduct caused Caterpillar, as well as treble and punitive damages, and attorneys' fees and costs. Caterpillar also seeks the following relief: the return of all compensation Caterpillar provided to Aon for serving as Caterpillar's broker; the recovery from Aon of all monies Aon obtained as a result of placing insurance and reinsurance that directly or indirectly involved Caterpillar; and an accounting, should one be necessary. Caterpillar seeks injunctive relief, including a prohibition on Aon's future use of the unlawful and improper activities described in more detail hereinafter, prejudgment interest, and such additional and further relief as the Court may deem just and proper.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

3.     This civil action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and this Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over claims arising under state law pursuant to 28 U.S.C. § 1367.

4.     Aon is subject to personal jurisdiction because it systematically and continuously transacts substantial business in this state and district.

5.     Venue is proper in this district pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b).

6.     Aon's business activities that are the subject of this Complaint are within the flow of, and substantially have affected, interstate and foreign trade and commerce.

## THE PARTIES

7.     Caterpillar is a Delaware corporation with its principal place of business at 100 N.E. Adams Street, Peoria, Illinois, 61629.  Caterpillar manufactures and sells construction and mining equipment, diesel and natural gas engines, and industrial gas turbines, and provides related services.  Caterpillar has facilities in the United States and elsewhere and sells its products and services throughout the United States and other parts of the world.

8.     Aon Corporation is a Delaware corporation with its principal place of business at 200 E. Randolph Street, Chicago, Illinois, 60601.  Aon has 43,000 employees in 500 offices in more than 120 countries.  Aon carries on business directly and through subsidiaries and affiliates located in the United States and elsewhere in the world, such as Aon Risk Services, Inc. of Illinois, and Aon Re Global, Inc.  Aon provides insurance brokerage, reinsurance brokerage, and risk management services.  It provides more of these services than any other company in the world.  Aon also provides human capital and management consulting and specialty insurance underwriting.

9.     Aon Risk Services, Inc. of Illinois is an Illinois corporation with its principal place of business at 200 E. Randolph Street, Chicago, Illinois, 60601.  It is an insurance brokering and risk management services subsidiary of Aon Corporation.

10.     Aon Re Global, Inc. ("Aon Re"), is a Delaware corporation with its principal place of business at 200 E. Randolph Street, Chicago, Illinois, 60601.  It is a leading global reinsurance broker and an Aon subsidiary.

11.     For many years, Caterpillar has been one of Aon's clients.  During the 1981 to 2004 time frame, Aon received millions of dollars in fees for serving as Caterpillar's insurance broker.  Caterpillar also paid tens of millions of dollars in insurance premiums for insurance policies placed by Aon with various insurance carriers during this period.

**AON'S BUSINESSES**

12.     Insurance brokers, such as Aon, serve an intermediary function in the insurance marketplace.   Insurance brokers match their clients, such as Caterpillar, with insurers. Commercial insurance comprises many lines of insurance covering a variety of commercial property and casualty risks, including general property and casualty, worker's compensation, director's and officer's liability, products liability, surety, boiler and machinery, malpractice, and commercial auto, fire, and marine policies.   In the commercial insurance realm, insurers are largely dependent on brokers to assure access to business.

13.     Aon also acts as a reinsurance broker.  Reinsurance is insurance purchased by an insurer, often to protect against especially large risks or risks correlated to other risks the insurer faces.  Reinsurance brokers, such as Aon, serve an intermediary function in the reinsurance marketplace.  They provide advice to insurers in selecting reinsurance coverage, and match those that seek reinsurance with reinsurers.

**AON'S PROMISES TO, AND RELATIONSHIPS WITH, ITS CLIENTS**

14.     Aon holds itself out as an independent expert able to provide specialized services to its clients, including analysis of risk and insurance and reinsurance options, procurement and renewal of insurance and reinsurance, interpretation of policies, and assistance with the filing of claims.  Clients pay Aon to obtain its undivided loyalty and objective advice on their complex insurance placements.  Clients rely on Aon to provide the best coverage for their needs at the best possible price and in a manner free of improper influences or activities.

15.     Aon repeatedly promised Caterpillar and its other clients that it would act with integrity and honesty to obtain cost-effective and appropriate insurance and reinsurance. Likewise, Aon repeatedly promised that it would not mislead or take unfair advantage of its

- 4 -

clients. The following representations on Aon's website are illustrative of Aon's oft-repeated promises and assurances to Caterpillar and other Aon clients:

- "Aon Corporation has a well-earned reputation for integrity. A reputation earned through unwavering daily commitment to honesty and acting with the highest ethical standards."

- "At Aon, we do not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair practice."

- **"Be honest with clients, treat them with respect and dignity and promise only what you can deliver.** Satisfied clients are the key to Aon's success. Earn our clients' continued loyalty every day by treating them fairly, delivering the products and services they want and exceeding their expectations."

- "Never mislead clients through deceptive acts or practices, false advertising claims, or misrepresentations regarding Aon's or our competitors' products and services."

- "Communications in proposals, bid preparations and contract negotiations must always be truthful."

- "**Avoid conflicts of interest**. A conflict of interest is any situation where the interests of the company or a company employee may differ from the interests of the client."

http://www.aon.com/about/pdf/aon_businessconduct_guidelines.pdf (last visited October 4, 2007).

16. Caterpillar is informed and believes, and therefore alleges here and throughout this Complaint, that in contravention of its promises and assurances, and in violation of the duties Aon owed to Caterpillar (and other clients), Aon:

- engaged in improper and unlawful business practices that deprived Caterpillar of Aon's loyalty and objective advice;

- engaged in improper and unlawful business practices where Caterpillar's interests, like those of other clients, were sacrificed in favor of Aon's own financial gain;

- entered into undisclosed agreements to obtain monies from insurers and reinsurers in exchange for increasing the volume, profitability, and/or retention of policies it placed with such insurers;

- entered into undisclosed agreements to provide artificially inflated insurance quotes and to rig bids; and

- failed to disclose to Caterpillar the nature and amount of these monies or activities and/or misled Caterpillar about same, and concealed the conflict of interest created by such agreements.

Through its improper and unlawful conduct, Aon subverted free and open competition and did not obtain for Caterpillar the best insurance coverage for its needs at the best possible price.

## AON'S RELATIONSHIP WITH CATERPILLAR

17.    Caterpillar's brokerage relationship with Aon dates back to 1981. Since that time, Caterpillar has used Aon for the placement of most of its external commercial insurance policies. Generally speaking, Caterpillar places two major areas of coverage through Aon: casualty/liability coverage (including, but not limited to, general commercial liability, auto, warehousemen's legal liability, aviation, employer liability, professional responsibility, medical liability, and excess, plus a significant umbrella element) and executive coverage (including, but not limited to, directors and officers, errors and omissions, fidelity, and fiduciary coverage). In 2004, Caterpillar placed more than $14 million in external premiums through Aon for these types of policies.

18.    One of Aon's most significant responsibilities has been to assist Caterpillar with its competitive bidding process for annually renewable insurance polices. Aon's duties include helping Caterpillar prepare requests for quote, assisting with identifying insurance carriers willing to write policies to cover Caterpillar's particular risk management needs, assisting Caterpillar in compiling and presenting to carriers the information they need to write their

quotes, and assisting in obtaining and evaluating the bids. All bids came through Aon – the insurance carriers did not provide their quotes or bids directly to Caterpillar.

19.    Caterpillar placed its faith in Aon to act loyally and in Caterpillar's best interests. Caterpillar relied on Aon to identify and suggest appropriate insurers from whom to seek bids and to contact appropriate insurers. Caterpillar also relied on Aon's advice about which insurer best met Caterpillar's insurance needs. Caterpillar trusted Aon to solicit fair and competitive bids from insurers, and to pass on all bids accurately. As Caterpillar's insurance broker, Aon claimed to act in Caterpillar's best interest.

20.    For most of Aon's relationship with Caterpillar, Aon's compensation from Caterpillar came through "traditional" broker commissions on a policy-by-policy basis. In other words, as with many insurance brokerage arrangements, Aon was "paid out of premiums" – the actual funds paid to Aon were deducted out of the premiums that Caterpillar paid for insurance coverage.

21.    Beginning in the late 1990s, Aon requested the payment of additional money for its brokerage services, which would be paid directly by Caterpillar. After a period of negotiations, Caterpillar agreed to a minimum brokering fee of approximately $500,000, instead of fees based on a percentage of policy premiums. Aon and Caterpillar negotiated and signed a written Service and Retainer Agreement effective for calendar year 2001. In subsequent years, written contracts with similar terms were signed.

22.    Pursuant to these agreements, Aon agreed to provide insurance broking and other services for Caterpillar in exchange for a fee. That fee varied from year to year, but for each year during the period 2001-04 the amount was in the $500,000-600,000 range. However, Aon agreed to offset the specified fee by "any actual and pre-paid commissions." In other words,

Aon agreed to inform Caterpillar of commissions it received from insurers, if any, and to reduce Caterpillar's fee by the amount of any commissions received. Caterpillar had no way to verify whether Aon's disclosures regarding the amount of fees it received each year from insurers, if any, was accurate, and relied entirely on Aon to be honest and forthright about disclosing this information to Caterpillar.

23.     Aon also stated in each of the Service and Retainer Agreements:

> Aon represents that it has the time, ability and professional expertise to perform the services required under this agreement in a professional, efficient, *trustworthy* and businesslike manner. *Aon represents that neither it nor its officers, agents, or employees have any personal or financial interest which would conflict or interfere with the provision of services to Caterpillar under this agreement.*

(Emphasis added.) Aon further agreed to "provide timely and accurate responses to Caterpillar's inquiries and requests for information."

24.     During the period 2001-2004, Caterpillar's cost of insurance rose significantly.

## ATTORNEYS GENERAL INVESTIGATIONS AND CHARGES

25.     Commencing in 2004 and extending through 2006, the New York Attorney General conducted an investigation of the business practices of insurance brokers and insurers. That investigation sparked similar investigations by other authorities, including the Illinois Attorney General, the Connecticut Attorney General, the Superintendent of Insurance of the State of New York, and the Director of the Division of Insurance, Illinois Department of Financial Regulation. Over that period, the authorities filed numerous civil and criminal cases against insurance and reinsurance brokers, insurers and reinsurers, and individuals.

26.     In March 2005, the New York Attorney General, the Illinois Attorney General, and the Connecticut Attorney General each filed state court complaints against Aon ("March 2005 complaints"). These complaints alleged unlawful conduct, such as (a) steering clients'

insurance business to favored insurers, (b) promising increased retail business to insurers in exchange for their commitments to use Aon's reinsurance services, (c) suggesting that insurers raise quotes to Aon's clients, (d) entering into undisclosed "producer funding agreements" whereby insurers directly funded the hiring of Aon brokers, (e) entering into secret "pay-to-play" agreements with insurers whereby Aon obtained undisclosed compensation, (f) agreeing with preferred insurers to "squeeze out" a competing insurer, (g) withholding a lower quote and placing a client with a higher bidding insurer, and (h) providing preferred insurers with first looks, last looks, and exclusive looks on preferred business.

27.    According to the lawsuits brought by the authorities, Aon and other brokers entered into secret agreements with some major insurance carriers to provide the brokers additional, undisclosed compensation in return for their placing their clients' insurance business with the carriers.  In Aon's case, this conduct began at least as early as 2001.

28.    The precise terms of these arrangements varied, but they commonly have required the insurer to pay kickbacks to the broker based on one or more of the following: (a) the volume of business a broker's clients placed with the insurer; (b) the quantity or proportion of the broker's clients that renewed policies with the insurer; and (c) the profitability to the insurer of the business placed by the broker with that insurer.

29.    These agreements, often referred to as "Market Service Agreements" (MSAs), "Placement Services Agreements" (PSAs), "Compensation for Services to Underwriters" (CSUs), "contingent commissions," or "overrides," were, if known to clients at all, described in a vague and misleading manner as being compensation paid by insurance carriers to insurance brokers for services provided to the carriers.

30.    In reality, these agreements were "pay to play" arrangements whereby carriers paid commissions merely for access to the broker's clients.  The fees bore no relation to any real service by the broker.  Aon, other brokers, and insurers passed on the costs of these payments to insureds.

31.    These agreements created conflicts of interest.  Rather than earning revenue strictly by helping clients find the best insurance, Aon and other brokers had the financial incentive to place policies based on the potential payments from these agreements, whether the payments were based on volume, retention, or profitability.  For example, Aon had the financial incentive to steer business to exceed volume thresholds under such agreements with insurers, thereby obtaining larger kickbacks for itself.  And, Aon had the financial incentive to dissuade its clients from seeking to maximize their insurance recoveries so that Aon could steer "low loss ratio" (i.e., low rate of claims) business to favored insurers, thereby increasing the insurers' profitability and generating larger kickbacks for itself.  Internally, Aon created a compensation system that financially benefited employees who steered placements to insurers that paid the highest contingent commissions.  Aon structured its business in an effort to maximize contingent commissions, and acted, to the detriment of its clients, to secure the financial benefits associated with these incentives it created for itself and its employees.

32.    Based on information set forth in a series of lawsuits and/or settlements involving government authorities and various insurance brokers, insurers, and individuals, Aon's co-conspirators in such agreements include Ace Ltd., American International Group, Inc., Allied World Holdings, Arch Group, Ltd., Chubb Corporation, CNA Financial Corporation, Endurance Specialty Insurance Ltd., Hartford Financial Services Group, Inc., Liberty Mutual Holding Co.,

Inc., St. Paul Travelers Companies, Inc., XL Capital Ltd., Zurich Financial Services, their subsidiaries and/or affiliates, and perhaps others.

33.    A July 2001 Aon email to several senior employees, describes some of the mechanics of these agreements as well as the perverse incentives they were designed to provide:

> "Attached is the 2001 market partner profile. . . . As you will see we have some significant objectives to hit with our partners for calendar year 2001. *We will not make our goals and maximize revenue if we place business with non partners*. You can see where agreements are more advantageous than others so use your common sense where business should go.   Some rules everyone needs to start following immediately.
>
> (1) *All new business is marketed to market partners first and foremost* . . . .
>
> 2) *Maximize business to markets where Aon gets the best arrangements*. We have a responsibility to grow our business with each partner or we will lose them in subsequent years . . . .
>
> (4) Existing accounts that are remarketed are to go to market partners first and foremost . . . .
>
> Aon has established the partner agreements as critical to meeting our revenue needs going forward.  *This can't be a higher priority to any of us*."

(Emphasis added.)

34.    Aon steered clients toward particular insurers with whom Aon had such agreements.   Aon was more concerned about hitting its goals under the agreements than in brokering the best insurance for its clients.  Aon manipulated presentations to clients to influence clients to choose favored insurers.  For example, in December 2003, when Aon was close to reaching a level of placement with CNA (an insurance carrier for Caterpillar) that would trigger a higher kickback under its contingent commission agreement, Aon "put CNA in the incumbent's seat," despite the existence of other insurers willing to quote.  In fact, Aon's Carol Spurlock wrote to CNA, "We have put you in an incumbent position, I don't think you can ask for more. *This could very well be the deal that brings us to the finish line*." (Emphasis added.)

- 11 -

35.    In May 2003, an Aon employee wrote about steering Union Pacific's business to AWAC Insurance (an insurance carrier for Caterpillar): "AWAC really wants this as in their eyes (1) they did a big favor for us with GE and Aon D&O (2) they wrote the D&O on Union Pacific and (3) *this helps with some of the fundamentals behind a PSA which is that we have the ability to steer business.*" (Emphasis added.)

36.    The agreements influenced Aon's selection of insurance carriers.  When Chubb (an insurance carrier for Caterpillar) complained about low levels of placement in certain regions, Carol Spurlock of Aon touted the real benefits to Chubb of the agreements: "I wanted to respond to your note below regarding the lack of focus based on the incentive relationship between out two firms. . . . *I can tell you unequivocally that we have maintained a very aggressive pro-Chubb position.* . . .  We have also spent time at our overall group meetings, conference calls, etc. stressing the value of the Chubb/Aon relationship and its financial impact[.]" (Emphasis added.)

37.    Concurrently, Aon threatened to withhold business from insurers who declined to accept such agreements.  Insurance companies also were told by Aon that they would need to increase their commission rates associated with such agreements in order to "incent" Aon to provide placements from Aon's clients, and, if they did not do so, Aon would move business to other insurers.

38.    Aon also entered into undisclosed agreements with insurers under which Aon would steer retail insurance business to certain insurers on the condition that those insurers would steer their reinsurance brokerage business to Aon Re or its affiliates.  In other words, Aon forced insurance carriers to use Aon as a broker for reinsurance.  It was common for Aon to

obtain reinsurance business by exploiting its brokerage clients in this fashion. Aon also received undisclosed contingent commissions in exchange for increased reinsurance placements.

39.     In a June 2000 email, an Aon employee spoke of just this sort of arrangement with CNA (an insurance carrier for Caterpillar): "A reminder that we positioned CNA as the partner market with AE and once we have reached a [sic] annual premium amount of 1MM then CNA is willing to discuss ways that Aon can receive either reinsurance or additional compensation."

40.     During 2000 and afterward, Aon had a comparable relationship with Chubb (an insurance carrier for Caterpillar). One Aon employee questioned in an email how Aon would internally allocate the monetary benefits associated with steered insurance and reinsurance brokerage business: "[F]urther to Mike's request earlier today about ARS [Aon Risk Services] inter-company true-ups, here's something to consider: if we get reinsurance business (i.e., the Chubb account) because of retail volume in lieu of overrides or because we channel business to reinsurance partners in lieu of overrides, how does ARS share in the revenue currently booked in R/I?"

41.     Likewise, in 2000 and afterward, Aon Re expressly conditioned providing increased retail insurance placements to Liberty Mutual (an insurance carrier for Caterpillar), RLI Insurance Company, and St. Paul Travelers (an insurance carrier for Caterpillar) on those companies providing increased reinsurance brokerage business to Aon Re.

42.     Aon and several of its Board members invested in Endurance (an insurance carrier for Caterpillar). An Endurance executive demanded that Aon steer more reinsurance business to his company: "But Endurance simply cannot always be the most competitive provider, we need

an unfair advantage to help us get an opportunity to find a place on a majority of Aon's major property accounts."

43.    Aon did not disclose to its clients the names of the insurers and reinsurers with which it had the foregoing agreements, the terms of these agreements, the amount of such compensation, or the ways in which such agreements and compensation distorted the marketplace, suppressed competition, breached its duties and obligations, affected insurance placement decisions, and damaged clients.    Indeed, Aon worked to actively conceal such agreements and unlawful acts through pressure, intimidation, and confidentiality agreements. Other insurance brokers acted similarly.

44.    In addition, Aon solicited, procured, and provided artificially inflated insurance quotes and bids to its clients.    For example, in September 2003, Zurich provided Aon with a bid for insurance coverage for Fieldstone Investment Corp.    Aon said the bid was too low and told Zurich it should raise the bid before bids were shown to Aon's client.    Zurich got the business with its artificially inflated bid.    As between Aon and Zurich, the extra premium from the artificially inflated bid was treated as a payoff with respect to prior business.    And, in July 2004, Zurich provided Aon with a bid for insurance coverage on a condominium project being developed by Pitcairn Properties, Inc.    Aon said the bid was too low and told Zurich it should raise the bid by approximately 50% before bids were shown to the client.    Zurich did so.    In this instance, it was AIG, rather than Zurich, that got the business.

45.    Aon also provided preferred insurers with first looks, last looks, and exclusive looks in exchange for improper compensation.    For instance, in May 2003, Chubb (an insurance carrier for Caterpillar) complained that Aon was about to move a line of insurance to a new insurer without giving Chubb a "last look," which Chubb was entitled to have under its

agreement with Aon. In the reinsurance arena, Aon represented to Endurance Re in June 2003 that by becoming a strategic partner, Endurance Re would have the "opportunity to personally review the entire listing of all current treaty abstracts," giving it "a unique opportunity to pre-select programs you are interested in participation [sic] as a reinsurer" and to "have the first opportunity to quote and participate in the program."

46.     Aon quickly settled the March 2005 complaints and "agreed to adopt a number of business reforms that will govern the [future] conduct of Aon's employees." These business reforms included the following:

- Aon agreed to accept as compensation only specific fees or percentages of premiums, and to not receive any commissions unless disclosed to clients in plain, unambiguous language. Aon agreed not to accept any money, compensation, or anything of value from insurers.

- Aon agreed not to request or receive contingent commissions from insurers.

- Aon agreed to cease the practice of "pay to play" arrangements.

- Aon agreed not to solicit, request, accept, or pass on to clients any false or inflated bid.

- Aon agreed to stop requesting or accepting from an insurer the promise to use Aon's reinsurance services.

- Aon agreed to disclose to its clients (a) all bids and quotes Aon received on its clients' behalf and (b) all compensation received.

47.     Aon's CEO, Patrick G. Ryan, released a public statement admitting that Aon improperly took advantage of contingent commissions and other arrangements that created conflicts of interest:

Aon and other insurance brokers and consultants entered into contingent commissions agreements and other arrangements that created conflicts of interest. I deeply regret that we took advantage of those conflicts. . . . Such conduct was improper and I apologize for it.

- 15 -

48.     Aon agreed to pay $190 million into a restitution fund from which its clients could make claims under certain conditions.  But any such claim would require a broad release and the amounts available to individual clients would fall woefully short of actual damages.

## CATERPILLAR SOUGHT, BUT WAS DENIED, SPECIFIC INFORMATION FROM AON

49.     Commencing before, and continuing after, Aon settled the March 2005 complaints, Caterpillar attempted to determine whether the above-described business practices affected Caterpillar, and, if so, to what extent.  Caterpillar initiated a dialogue with Aon and requested the opportunity to review Aon documents and information related to Caterpillar and its policies.  Although Aon intimated that it would be willing to cooperate, it failed to respond with much information, while engaging in obfuscation and concealment over a considerable period of time.

50.     Caterpillar reminded Aon of its contractual obligation to respond to Caterpillar's information requests in an accurate, complete, and timely fashion.  Nevertheless, Aon elected not to comply with its obligations.

51.     Aon's failure to provide the requested information is part of its pattern of concealing the names of the carriers with which it had the contingent commission agreements, the terms of the agreements, the amount of compensation received under such agreements, and the ways in which such agreements and compensation distorted the marketplace, suppressed competition, breached its duties and obligations, affected insurance placement decisions, and damaged clients.

52.     Because Aon continues to be Caterpillar's insurance broker, Caterpillar faces the prospect of continued injury by the improper business practices described herein.

- 16 -

## CLAIMS AGAINST AON

### COUNT I
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (INFLATED BIDS/BID-RIGGING – PER SE ILLEGALITY)

53.     Caterpillar adopts and realleges the allegations made in Paragraphs 1-52 as though fully set forth herein.

54.     On information and belief, Aon has entered into contracts and engaged in combinations and conspiracies in restraint of trade that constitute per se violations of Section 1 of the Sherman Act, in that:

     a.    Aon engaged in a scheme of submitting inflated/rigged bids for the sale of commercial insurance;

     b.    Aon orchestrated, coordinated, and supervised this scheme amongst its co-conspirators, which, but for Aon's scheme, would have been competitors for the sale of commercial insurance;

     c.    Aon steered insurance contracts to and among its co-conspirators, denying Caterpillar the benefits of free and open competition; and

     d.    Aon and its co-conspirators engaged in activities to give the appearance of competition where none existed.

55.     The insurers that have participated in this conspiracy with Aon are Ace, AIG, Allied, Arch, Chubb, CNA, Endurance, Hartford, Liberty, St. Paul Travelers, XL, Zurich, their subsidiaries and/or affiliates, and perhaps others.  These are leading competitors in the market for the sale of commercial insurance.

56.     The alleged activity proximately has caused injury to Caterpillar's business and property and to competition:

     a.    by restraining competition among insurers for the sale of commercial insurance;

     b.    by artificially raising, fixing, or stabilizing the prices for the sale of commercial insurance;

c.    by artificially limiting the supply of commercial insurance; and

d.    by decreasing the quality of commercial insurance coverage.

57.    Accordingly, Aon is liable for three times the damages suffered by Caterpillar in an amount to be proven at trial, and for reasonable attorneys' fees and expenses. Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

**COUNT II**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**(INFLATED BIDS/BID-RIGGING – NON-PER SE ILLEGALITY)**

58.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-52 as though fully set forth herein.

59.    In the alternative to Count I, Caterpillar alleges, on information and belief, that Aon has entered into contracts, and engaged in combinations and conspiracies in restraint of trade that violate Section 1 of the Sherman Act under quick look or rule of reason analysis.

60.    To the extent necessary for purposes of this claim, the relevant product market is the sale of commercial insurance through insurance brokers, with the sale of commercial insurance through insurance brokers to large and medium sized companies constituting relevant product submarkets. Other insurance products are not reasonably interchangeable with or economic substitutes for the sale of commercial insurance through insurance brokers. The nature of the relevant product market has been recognized by industry participants, including Aon, in their internal organization structures and marketing approaches.

61.    To the extent necessary for purposes of this claim, the relevant geographic market in which Aon's antitrust violations occurred is global in nature, with the United States

constituting a geographic submarket. The nature of the relevant geographic market has been recognized by industry participants, including Aon, in their internal organization structures and marketing approaches.

62.    The insurers that have participated in this conspiracy with Aon are Ace, AIG, Allied, Arch, Chubb, CNA, Endurance, Hartford, Liberty, St. Paul Travelers, XL, Zurich, their subsidiaries and/or affiliates, and perhaps others. These are leading competitors in the market for the sale of commercial insurance through insurance brokers.

63.    The relevant market is highly concentrated, with the two top firms, Aon and Marsh & McLennan Companies, Inc., dominating the business. There has been a trend of increasing concentration in the insurance brokerage business over the last two decades, primarily as the result of merger and acquisition activity involving competitors. There are substantial barriers to entry. To the extent necessary for purposes of this claim, Aon possesses market power in the relevant market.

64.    On information and belief, Aon has entered into contracts and engaged in combinations and conspiracies in restraint of trade that constitute violations of Section 1 of the Sherman Act, in that:

      a.    Aon engaged in a scheme of submitting inflated/rigged bids for the sale of commercial insurance through insurance brokers;

      b.    Aon orchestrated, coordinated, and supervised this bid-rigging amongst its co-conspirators, which, but for Aon's scheme, would have been competitors for the sale of commercial insurance through insurance brokers;

      c.    Aon steered insurance contracts to and among its co-conspirators, denying Caterpillar the benefits of free and open competition; and

      d.    Aon and its co-conspirators engaged in activities to give the appearance of competition where none existed.

65.     The alleged activity proximately has caused injury to Caterpillar's business and property and to competition:

        a.      by restraining competition among insurers for the sale of commercial insurance through insurance brokers;

        b.      by artificially raising, fixing, or stabilizing the prices for the sale of commercial insurance through insurance brokers;

        c.      by artificially limiting the supply of commercial insurance through insurance brokers; and

        d.      by decreasing the quality of commercial insurance coverage through insurance brokers.

66.     Accordingly, Aon is liable for three times the damages suffered by Caterpillar in an amount to be proven at trial, and for reasonable attorneys' fees and expenses.  Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

### COUNT III
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (TYING – PER SE ILLEGALITY)

67.     Caterpillar adopts and realleges the allegations made in Paragraphs 1-52 as though fully set forth herein.

68.     On information and belief, Aon has entered into tying arrangements, which constitute contracts, combinations, and conspiracies in restraint of trade that are per se violations of Section 1 of the Sherman Act, as described herein.

69.     For purposes of this claim, the tying product is the brokering of commercial insurance and the tied product is the brokering of reinsurance.   These are separate products.

- 20 -

They are sold in different markets, their function is different, and there is separate demand for them.

70.     For purposes of this claim, the relevant product market for the tying product is the brokering of commercial insurance, with the brokering of such products for large and medium sized companies constituting relevant product submarkets.  Other brokering services are not reasonably interchangeable with or economic substitutes for commercial insurance brokering, as has been recognized by industry participants, including Aon, in their organizational structures and marketing approaches.

71.     For purposes of this claim, the relevant geographic market for the tying product is global in nature, with the United States constituting a geographic submarket.  The relevant geographic market and submarket have been recognized by industry participants, including Aon, in their internal organization structures and marketing approaches.

72.     For purposes of this claim, the relevant product market for the tied product is the brokering of reinsurance.  Other brokering services are not reasonably interchangeable with or economic substitutes for reinsurance brokering, as has been recognized by industry participants, including Aon, in their organizational structures and marketing approaches.

73.     For purposes of this claim, the relevant geographic market for the tied product is global in nature, with the United States constituting a geographic submarket.  The relevant geographic market and submarket have been recognized by industry participants, including Aon, in their internal organization structures and marketing approaches.

74.     The commercial insurance brokerage market is highly concentrated, with the two top firms, Aon and Marsh & McLennan Companies, Inc., dominating the business.  There has been a trend of increasing concentration in the insurance brokerage business over the last two

decades, primarily as the result of mergers between competitors and acquisitions of competitors. There are substantial barriers to entry into the commercial insurance brokerage market. Aon has market power in the market and submarkets for commercial insurance brokering.

75.    On information and belief, Aon agreed to place Caterpillar's commercial insurance business with commercial insurers on the condition that those very same commercial insurers purchase reinsurance brokerage services from Aon. In other words, Aon forced many commercial insurers who wished to sell commercial insurance to Aon's commercial insurance brokerage clients to purchase reinsurance brokering services from Aon. The insurers involved are AIG, Chubb, CNA, Endurance, Liberty, St. Paul Travelers, their subsidiaries and/or affiliates, and perhaps others.

76.    On information and belief, Aon's tying arrangements affected a substantial amount of commerce in and affected competition in the tying and tied product markets, artificially inflated the price Caterpillar paid for commercial insurance, and proximately caused injury and damage to Caterpillar.

77.    Accordingly, Aon is liable for three times the damages suffered by Caterpillar in an amount to be proven at trial, and for reasonable attorneys' fees and expenses. Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

## COUNT IV
## VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### (TYING – NON-PER SE ILLEGALITY)

78.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-52, and Paragraphs 67-76 as though fully set forth herein.

79.    In the alternative to Count III, Aon's alleged tying arrangements, which constitute contracts, combinations, and conspiracies in restraint of trade, violate Section 1 of the Sherman Act under rule of reason analysis. Aon's tying scheme lacked any competitive justification, and served to injure and reduce competition in the tying and tied product markets.

80.    Accordingly, Aon is liable for three times the damages suffered by Caterpillar in an amount to be proven at trial, and for reasonable attorneys' fees and expenses. Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

## COUNT V
## VIOLATION OF THE ILLINOIS ANTITRUST ACT

81.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-80 as though fully set forth herein.

82.    The activities of Aon alleged above are within the flow of, and have a substantial affect on, commerce in Illinois.

83.    On information and belief, the above-described conduct injured competition, and as a direct and proximate result of these practices, Caterpillar suffered injury to its business and property.

84.    The above-described conduct violates the Illinois Antitrust Act, 740 ILCS 10/3.

85.    Aon is liable for three times the damages suffered by Caterpillar in an amount to be proven at trial, and for reasonable attorneys' fees and expenses. Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

## COUNT VI
## VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
## DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS § 505/2

86.     Caterpillar adopts and realleges the allegations made in Paragraphs 1-85 as though fully set forth herein.

87.     Under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, "[u]nfair methods of competition and unfair or deceptive acts and practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived, or damaged thereby."

88.     On information and belief, Aon, acting in the course of commerce in Illinois and elsewhere:

- engaged in improper and unlawful business practices that deprived Caterpillar of Aon's loyalty and objective advice;

- engaged in improper and unlawful business practices where Caterpillar's interests, like those of other clients, were sacrificed in favor of Aon's own financial gain;

- entered into undisclosed agreements to obtain monies from insurers and reinsurers in exchange for increasing the volume, profitability, and/or retention of policies it placed with, or with respect to, such insurers or reinsurers;

- entered into undisclosed agreements to provide artificially inflated insurance quotes and to rig bids; and

- failed to disclose to Caterpillar the nature and amount of these monies or activities and/or misled Caterpillar about same, and concealed the conflict of interest created by such agreements.

89.     Contingent commission agreements created an undisclosed conflict of interest between Aon and Caterpillar because it created the incentive for Aon to steer Caterpillar to

insurers with whom Aon had contingent commission agreements, rather than to insurers who could best meet Caterpillar's needs, and to steer reinsurance business that directly or indirectly involved Caterpillar to reinsurers in a way that benefited Aon rather than Caterpillar.

90.     The contingent commission agreements, which constituted material facts, were never disclosed by Aon to Caterpillar, or they were disclosed inadequately or in a misleading manner.

91.     Consonant with the financial incentives set forth in the contingent commission agreements, Aon, in the pursuit of larger kickbacks, steered Caterpillar to insurers with whom Aon had such agreements, rather than to insurers who could best meet Caterpillar's needs, and steered reinsurance business that directly or indirectly involved Caterpillar to reinsurers in a way that benefited Aon rather than Caterpillar.

92.     Aon also omitted and concealed material facts regarding quotes and bids insurers submitted to Aon and submitted inflated or fictitious quotes and bids to Caterpillar that were deceptive, misleading, and material in nature.

93.     By steering business in the ways described above, accepting kickbacks, concealing the actual amount of commissions and benefits received, omitting and concealing material facts regarding quotes and bids insurers submitted to Aon, and submitting quotes and bids that were deceptive, misleading, and material in nature, Aon employed, and knew that it was employing, unfair methods of competition and unfair or deceptive acts and practices.

94.     In a posting on its website, Aon recognizes and accepts the improper, unfair, and deceptive nature of the actions alleged above:

**Fair Competition**

Fair dealing in the marketplace is required not only by Aon's high ethical standards, but also by the antitrust and unfair competition laws of the United States and other countries. The following are examples of improper conduct that must be avoided:

- **Never** accept kickbacks

- **Never** "steer" business to a market based on anything other than the client's best interests

- **Never** solicit or accept inflated or fictitious quotes for presentation to a client

http://www.aon.com/about/pdf/aon_businessconduct_guidelines.pdf (last visited October 4, 2007).

95.     Caterpillar was injured and damaged as a proximate result of Aon's violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.  Aon is liable for damages suffered by Caterpillar in an amount to be proven at trial, and Aon's egregious conduct warrants an award of punitive or exemplary damages and attorneys' fees.  A finding of liability would serve the interests of consumers by creating disincentives for insurance and reinsurance brokers to deceive their clients and to conceal material facts.  Caterpillar also seeks permanent injunctive relief to stop these unlawful acts and/or to preclude them from happening again.

## COUNT VII
## BREACH OF FIDUCIARY DUTY

96.     Caterpillar adopts and realleges the allegations made in Paragraphs 1-95 as though fully set forth herein.

97.     Caterpillar and Aon had a fiduciary relationship in which Aon had a responsibility to provide services and advice for the benefit of Caterpillar.  Because of this relationship, Caterpillar placed confidence and trust in Aon, authorized Aon to exercise discretionary

functions for Caterpillar's benefit, and relied on Aon's superior expertise in risk management and the procurement of insurance. Aon solicited and accepted that confidence and trust.

98.    Based on the relationship between the parties and the representations described above, Aon is a common law fiduciary to Caterpillar, and therefore owed Caterpillar: (a) a duty of loyalty to act in Caterpillar's best interests and to always put Caterpillar's interests ahead of Aon's own interests; (b) a duty of full and fair disclosure and complete candor in connection with any insurance-related products purchased by Caterpillar or services rendered by Aon, including the duty to disclose the source and amounts of all income Aon receives in or as a result of any transaction involving Caterpillar; (c) a duty to provide objective and impartial advice in connection with any insurance-related products purchased by Caterpillar or services rendered by Aon; and (d) a duty to use Aon's best business judgment in connection with any insurance-related products or services purchased by Caterpillar.

99.    On information and belief, Aon breached these duties. Rather than providing full and fair disclosure and loyal and objective advice, using its best business judgment, Aon maximized its contingent commissions and other improper compensation at the expense of Caterpillar. The financial incentives inherent in the arrangements described above caused Aon to recommend that Caterpillar purchase insurance not from the best suited or lowest cost carrier, but from insurers from whom Aon could reap an additional profit.

100.    Aon is liable for damages suffered by Caterpillar in an amount to be proven at trial, and Aon's egregious conduct warrants an award of punitive or exemplary damages and attorneys' fees.

## COUNT VIII
## COMMON LAW FRAUD

101.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-100 as though fully set forth herein.

102.    On information and belief, Aon intentionally omitted and concealed material facts regarding the true amount of monies Aon obtained as a result of placing insurance and/or reinsurance that directly or indirectly involved Caterpillar.  Aon also omitted and concealed material facts regarding (a) quotes and bids insurers submitted to Aon for providing insurance to Caterpillar, and (b) what insurers offered the most appropriate and best coverage for Caterpillar's insurance needs.

103.    Caterpillar reasonably relied on Aon's representations, which omitted material facts.  Aon affirmatively hid and concealed the truth about the patterns and practices of doing business described above, and Caterpillar had no way of knowing or learning the truth about Aon's receipt of contingent commissions from insurers and its other unlawful acts.

104.    As a result of Aon's omissions, Caterpillar suffered harm, including paying increased premiums and receiving less competitive bids from insurers.

105.    Aon is liable for damages suffered by Caterpillar in an amount to be proven at trial, and Aon's egregious conduct warrants an award of punitive or exemplary damages and attorneys' fees.

## COUNT IX
## BREACH OF CONTRACT

106.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-105 as though fully set forth herein.

107.    Aon and Caterpillar entered into contracts, typically called Service and Retainer Agreements, pursuant to which Aon agreed to provide insurance brokering and other services.

108.    Caterpillar performed its material obligations under these contracts.

109.    On information and belief, Aon materially breached these contracts by:

a.    failing to perform the services set forth therein based on best practices and in the best manner;

b.    failing to perform the services and duties specified therein in accordance with performance standards specified therein;

c.    failing to perform the services required in a professional, efficient, trustworthy, and businesslike manner;

d.    failing to provide proper advice to assist Caterpillar in managing insurance costs;

e.    failing to develop, negotiate, recommend, and implement cost-effective insurance and/or risk financing programs;

f.    failing to negotiate renewal terms and conditions with existing or alternative carriers to minimize costs and maximize protection;

g.    failing to represent the interests of Caterpillar rather than the interests of Aon and/or the insurers and reinsurers;

h.    failing to issue accurate, timely premium invoices for coverage placed;

i.    failing to accurately report the amount of commissions it received from insurers and reinsurers, thus improperly increasing the amount Caterpillar paid to Aon;

j.    failing to keep Caterpillar informed of significant developments;

j.    failing to maintain and provide information about additional compensation, including actual and pre-paid commissions;

k.    failing to provide timely, accurate, and complete responses to Caterpillar's inquiries and requests for information; and

l.    failing to disclose and affirmatively concealing financial interests that conflicted or interfered with the provision of services to Caterpillar.

110.    By these actions, Aon also breached the implied covenant of good faith and fair dealing.

111.    As a result of Aon's material breaches, Caterpillar proximately suffered harm.

112.    Aon is liable for damages suffered by Caterpillar in an amount to be proven at trial.  By contract, Caterpillar also is entitled to recover reasonable costs and attorneys' fees.

## COUNT X
## CIVIL CONSPIRACY

113.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-112 as though fully set forth herein.

114.    Aon conspired with insurers and reinsurers for the purpose of accomplishing through concerted action an unlawful purpose through unlawful means, as described above.

115.    Aon is liable for damages suffered by Caterpillar in an amount to be proven at trial, and Aon's egregious conduct warrants an award of punitive or exemplary damages.

## COUNT XI
## UNJUST ENRICHMENT/RESTITUTION

116.    Caterpillar adopts and realleges the allegations made in Paragraphs 1-115 as though fully set forth herein.

117.    Aon has unjustly received and retained benefits from Caterpillar and from others occasioned by Aon's actions to Caterpillar's detriment.  Caterpillar has a better claim to those benefits than does Aon.

118.    Aon's retention of those benefits violates the fundamental principles of justice, equity, and good conscience.

119.    Accordingly, Aon should be instructed to account for and turn over to Caterpillar those funds in an amount to be proven at trial.

## PRAYER FOR RELIEF

Caterpillar asks the Court to grant the following relief:

A.    Treble damages and attorneys' fees as remedies for Aon's violations of the Sherman Act and the Illinois Antitrust Act, and injunctive relief permanently enjoining Aon from violating said Acts through the improper and unlawful conduct set forth in this Complaint;

B.    Damages, punitive or exemplary damages, and attorneys' fees for Aon's violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

C.    Damages, punitive or exemplary damages, and attorneys' fees for Aon's violations of common law;

D.    Forfeiture of compensation retained by Aon; restitution of payments received from Caterpillar; and recovery of amounts by which Aon was unjustly enriched;

E.    An equitable accounting, if necessary;

F.    Injunctive relief against the activities complained of above, and as necessary to effectuate the relief requested above;

G.    Prejudgment interest; and

H.    Such additional and further relief as the Court deems just and proper.

# REQUEST FOR JURY TRIAL

Caterpillar requests a trial by jury.

Respectfully submitted,

Caterpillar Inc.

s/ Daniel L. Johns
Daniel L. Johns, Bar Number 1339389 IL
Attorney for Plaintiff
WESTERVELT, JOHNSON,
NICOLL & KELLER, LLC
411 Hamilton Boulevard, 14th Floor
Peoria, IL 61602-1104
Telephone:  (309) 671-3550
Facsimile:  (309) 671-3588
e-mail:  djohns@wjnklaw.com

Robert G. Abrams (Lead Counsel), Bar Number 211557 DC
Gregory L. Baker, Bar Number 000412146 DC
Andrew M. Reidy, Bar Number 288357 DC
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone:  (202) 783-0800
Facsimile:  (202) 383-6610
e-mail: abramsr@howrey.com
        bakerg@howrey.com
        reidya@howrey.com

Daniel L. Johns, Bar Number 1339389 IL
Michele Miller, Bar Number 6273486 IL
WESTERVELT, JOHNSON,
NICOLL & KELLER, LLC
411 Hamilton Boulevard, 14th Floor
Peoria, IL 61602-1104
Telephone:  (309) 671-3550
Facsimile:  (309) 671-3588
e-mail: djohns@wjnklaw.com
        mamiller@wjnklaw.com

Attorneys for Plaintiff

**E-FILED**
Friday, 12 October, 2007  02:36:24 PM
Clerk, U.S. District Court, ILCD

RECEIVED
OCT 12 2007
CLERK'S OFFICE
PEORIA, ILLINOIS

JS 44 (Rev. 11/04)

## CIVIL COVER SHEET

07-1274

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

### I. (a) PLAINTIFFS
Caterpillar Inc.

### DEFENDANTS
Aon Corporation; Aon Risk Services, Inc. of Illinois; Aon Re Global, Inc.

**(b)** County of Residence of First Listed Plaintiff   Peoria, Illinois
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Cook, Illinois
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Howrey LLP, 1299 Pennsylvania Ave., N.W., Washington, D.C., 20004, (202) 383-6615

Attorneys (If Known)

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question (U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☒ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

### V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
15 U.S.C. 1, 15, 26
Brief description of cause:
Suit for damages and equitable relief arising out of conspiracy among defendants, insurers, and reinsurers.

### VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

### VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Hon. Garrett E. Brown, Jr.
DOCKET NUMBER  04-5184 (GEB) [MDL 1663]

DATE  10/12/07

SIGNATURE OF ATTORNEY OF RECORD   Daniel L. Johns

**FOR OFFICE USE ONLY**

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____